[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 9954
Nature of Proceedings
After nineteen continuous months of foster placement, fifteen of which as neglected children committed to the Department of Children and Youth Services (DCYS), Nathan G., born 3/1/89 and his brother, Michael G., born 8/13/90, on June 10, 1992 became subjects of these petitions by which DCYS seeks to terminate the parental rights of Alice C. (a/k/a Alice G.) and John G., their mother and father, so that they could be freed for the permanency of adoptive placements. At the same date, Alice C. filed a petition seeking revocation of the commitment of both children.
After personal service on the parents, both appeared with separate court-appointed counsel in Willimantic Superior Court for Juvenile Matters on 7/7/92 and entered denials to all of the grounds alleged for terminating their parental rights: As to the father, all of the nonconsensual grounds as set forth in Sec. 17a-112 of the Connecticut General Statutes (Rev. 1991) applicable to children previously found to be neglected or uncared for under the provisions of Section 46b-129; as to the mother, all of such grounds other than abandonment.
After the securing of an updated psychological evaluation by the same clinical psychologist who had seen the family in February 19, 1991, a trial date was set in mid-October, 1992, for both the pending termination petitions and the revocation petitions filed by the mother. For reasons which do not appear in the court record, trial did not go forward in October but was continued for seven months, commencing on May 19, 1993. On the fifth nonconsecutive trial day, Alice C. withdrew her opposition to the termination of her parental rights and her pending revocation petitions and executed a written consent to such termination and the placement of her sons in adoption. After canvas by the Court on June 23, 1993, in the presence of her attorney, Alice's consent was found to have been given voluntarily and knowingly, and held to be a valid ground for the termination of her parental rights. By oral amendment, the petitioner added to the grounds alleged as to the mother that of consent. Decision was reserved on the ordering of such termination, however, until such time as grounds might be found to terminate the parental rights of John G., since the best interests of these children would not CT Page 9955 have been served by terminating the rights of only parent, leaving them prevented by the continuing parental rights of the other parent from being placed in adoption. Alice C. and her attorney were excused from the final day of trial on June 30, 1993, and from the filing of trial memoranda, the last of which was received August 3, 1993.
Since these petitions have not been amended as to the father, the adjudication date, on which grounds to terminate his parental rights must be determined, remains the date of original filing June 10, 1992. The dispositional date on which judgment must be rendered as to the children's best interest is the last day of trial; June 30, 1992. The period of reserved decision began August 3, 1992, the day the last trial memorandum was filed.
FACTS
Evidence offered in five days of trial, interpreted in the light of the prior record in this court involving this family, of which judicial notice is taken, supports the finding of the following facts:
DCYS first began to receive referrals from community service providers in the latter part of 1989 when Nathan was nine months old. Representatives from the Visiting Nurses and Home Health Aides, who had been working for months with these parents and Nathan, made referrals based upon chronically hazardous conditions in the home, (e.g. exposed electric outlets and cords; broken glass on the floor; cigarettes left exposed to an exploring child; food covered with roaches, etc.) and the parents' lack of responsiveness to the injuries to Nathan caused by such hazards. In late January of 1990, the local hospital, after an incident of allegedly assaultive behavior displayed by the mother toward both her husband and son, made another referral. DCYS referred the family to yet another community agency, Family Preservation Services, in an attempt to keep the family intact. By the summer of 1990, these attempts, too, had produced no lasting results: Affidavits accompanied a neglect petition filed on behalf of Nathan on 7/23/90 which referred to still other referrals received from EastConn., P.I.P., Stepping Stones and Home Health Aides, all concerning injuries suffered by Nathan as well as his poor hygiene. These conditions, as well as the parents' inability to sustain instructions on safe child care, CT Page 9956 continued to be noted by DCYS social workers as well as the private service providers. Discord between the parents, who failed to cooperate with recommended marriage counseling, resulted in police intervention shortly before DCYS filed the petition alleging neglect of Nathan. Twelve days before the initial hearing on that petition, Michael was born, an event for which the parents appeared to be unprepared. On a visit by the DCYS worker when Michael was a week old, he was found in the care of an unlicensed babysitter whose name the parents could not later recall. On this occasion Nathan was again observed with a bruised forehead, again eating cigarette butts.
When Michael was less than two weeks old, the parents signed a voluntary permission to place both children, and when they rescinded such permission soon after, this court granted DCYS an Order of Temporary Custody (OTC) based upon these affidavits.
After evidentiary hearings on August 29 and 30, 1990, the OTC was vacated upon the parents' agreeing to comply with the terms of a service agreement with DCYS, focused on their cooperation with various service providers. Despite their ostensible cooperation with several such helping entities, in less than three months, on 11/5/90, DCYS secured another OTC based upon affidavits of new concerns for the children's health and safety, submitted by both DCYS and the direct service providers, which included Nathan's continuing access to cigarettes, Nathan having been left on one occasion without adult supervision for an extended period, and inadequate feeding and administration of medication to the infant. Even after Michael contracted pneumonia when less than two months of age, the parents failed to keep medical appointments for him; both parents persisted in smoking while caring for the children; neither parent evidenced any improved ability to maintain the hygiene of either child or to keep their home in a safe physical condition. DCYS initially had secured a 96-hour administrative hold in order to remove the boys from the care of a neighbor who appeared equally incapable of adequate child care. After another contested hearing on 11/14/90, the second OTC was sustained, and evaluations with a psychologist ordered. Dr. Robert Meier, following a February, 1991, evaluation (State's Exh. A), recommended continuing to provide services to the parents but for no more than one year following their loss of custody, with return of CT Page 9957 the children premised on a demonstrated ability to provide safe and adequate day-to-day care:
 They are able to comprehend what needs to be done and have the capacity to learn the basic skills to care for the children and to properly utilize services. Failure to do so within one year raises serious questions about their willingness to do what is necessary to meet the needs of these children and to place the children's needs first. (Id. p. 11). . . . If they cannot show significant improvement within one year from the date of placement, permanent placement outside the natural home appears to be in the best interests of these children. (Id. p. 12).
On 3/21/91, based upon written pleas of nolo contendere, the boys were adjudicated as to both parents, to be both neglected and uncared for, the court finding that continuation in the home would be inconsistent with the children's best interests.
From the date of commitment until November of 1991, both parents continued to live in the family home, receiving services there from both a parent aide, Sandra Lucas, and from EastConn's preschool program, or P.I.P., under the direction of Kathleen Bradley. Counseling centered around helping the parents prepare their home for the children's visits to ensure safety, health and good nutrition. According to Ms. Lucas, after more than a year of contact with the parents, together and separately, "They never achieved this." (Testimony of 5/19/93). Nor, in her opinion, had they ever demonstrated the ability to meet the emotional needs of these children. Kathleen Bradley, manager of the EastConn P.I.P. program, had worked with the family for five months before the children were committed, and for nearly a year following. Her conclusion was the same. (Child's Exh. One).
In the fall of 1991, the father briefly held a job at a local publisher. While there, he met a woman co-worker, whom he brought home to live with himself and his wife. This led to marital discord, the involvement of the police and ultimately the securing by Alice of a restraining order which resulted in the father moving out of the family home in CT Page 9958 November of 1991. Both Sandra Lucas and Kathleen Bradley continued working with Alice until she, too, left the apartment in Willimantic to move to Danielson in March of 1992. John had no fixed address where such services could be provided to him on a separate basis at that time.
After John moved, he continued to seek visits with his sons, which were provided in DCYS offices. In January of 1992, however, against the advice of the DCYS social worker who warned of the short memories of very young children, John accompanied an unrelated woman and her children to Oklahoma by bus, the reason given being his understanding that a restaurant job awaited him there. Although that proved not to be the case, he remained in Oklahoma for nearly three months before returning to Connecticut in April of 1992 and seeking resumption of contact with his children.
After he resumed visits with his children, Sandra Lucas began providing services during these visits. Although he demonstrated some improvement in providing safe circumstances during these visits, since the father at no time lived in quarters available for visitation on any sustained basis, the parent aide could never observe the quality of his care in his own residence, and therefore could not recommend beginning unsupervised visits.
At the time of her last contact with the family in February of 1992, after close to 200 total contacts totaling hundreds of hours, Kathleen Bradley concluded that neither parent had progressed beyond the "direct prompting" stage of response to parenting instruction. After more than two years of providing services, she found both parents still incapable of providing a safe, adequate home for these children unaided. (Testimony of 5/26/93). While John, who had low normal intelligence, had displayed more ability to retain such instructions than had his retarded wife, in Bradley's opinion he would still need five to six hours a day of close assistance, seven days a week, before these children could be safely entrusted to his care. Since he had never offered any residence to which he could bring his sons after November of 1991, there was no way to assess the accuracy of his own estimate of his abilities. Care of these children is complicated by the fact that both have "global developmental delays," making a safe environment and good hygiene even more important than it might be for normal children. (Id.). CT Page 9959
Testifying in his own behalf, John acknowledged that he had been unemployed for all but two months of the preceding two years; that since November of 1991 he had never had a place of his own but had always stayed with friends; that he currently received mail at a local Soup Kitchen and was ineligible for even city welfare (and therefore for any medical coverage for himself) because he had no mailing address; that at the time of giving testimony he was living in a six room house with eleven other people, was paying no rent and at the moment had no job prospects. The lessee of his present quarters was a woman who had just lost custody of three of her five children and, with her separated husband, had recently been arrested for sexual abuse of children. (Testimony of respondent father, 6/30/93).
In his trial memorandum, the father acknowledged that he ". . . has not sought to reestablish custody through a revocation of the commitment nor has he indicated his intention to do so in the foreseeable future." (unnumbered 10th page) . . . "and indeed may not be able to re-establish custody in the foreseeable future." (unnumbered 10th and 11th pages).
ADJUDICATION — MOTHER
By oral amendment granted without objection on 6/23/93, the petition as to Alice C. was amended to add consent. After a careful canvas by the court on the record in the presence of her counsel, such consent was found to have been given voluntarily and knowingly with full awareness of the legal consequences, and accepted as a valid ground for terminating her parental rights. This being so, no finding is made as to the nonconsensual grounds pleaded which are, therefore, dismissed without finding or prejudice.
ADJUDICATION — FATHER
Lacking any amendment to the petitions seeking to terminate the parental rights of John G., the adjudicatory date must be regarded as the date such petitions were filed, 6/10/92. The petitioner alleges and argues that sufficient proof has been offered to sustain a finding of all four of the nonconsensual grounds pleaded. This court differs with the petitioner on three of the four grounds. CT Page 9960
1) Abandonment — Against the advice of the DCYS social worker, John chose to leave Connecticut in January of 1992, ostensibly in search of a job working in a restaurant. By his own admission, he learned upon arriving in Oklahoma that no such job existed, but instead of immediately returning to the state of residence of his two sons, he elected to remain out of contact with them for another three months, returning some time in April of 1992. Had this absence from the lives of his children continued for the 12 months required by the statute, there is no question that, regardless of his purported reason for so doing, he had abandoned his children, since this ground must be determined by the impact on children, not by the intent of parents. But the petitioner has offered no clear and convincing reason why the balance of the 12 months must be waived. Both before and after his absence from the state, John sought visitation with his sons, and exercised it almost to the full extent permitted by DCYS. During the fifteen months of commitment prior to the institution of this action, John had visited during all but those three months in 1992. While his failure to secure a home where his children could be permitted to visit, and eventually to live, is relevant to the issue of his rehabilitation, it cannot do double duty as a failure to manifest "a reasonable degree of interest, concern or responsibility." Something less than three months of abandonment does not constitute clear and convincing proof of abandonment under the statute, and no evidence was offered to convince the trier of fact that the balance of the 12 months should be waived.
2) Acts of commission or omission. Both children have been in the legal custody of DCYS continuously since November of 1990. All visitation with them by their parents has been under professional supervision. Had the children suffered any denial of necessary care by reason of acts of parental commission or omission, the responsibility would have been that of DCYS or its agents. But the petitioner has, in fact, offered no evidence that either boy has suffered any deprivation of care of any kind during either the 15 months of commitment preceding the initiation of this action, or the four months preceding commitment during which the boys were in the petitioner's temporary custody. Lacking evidence of such deprivation, this ground for termination of the respondent father's parental rights must be dismissed. CT Page 9961
3) Lack of parent-child relationship. The petitioner, in her trial memoranda, concedes that under the existing judicial interpretation of this ground, it cannot be sustained in this case. Both boys recognize John G. and are undisturbed by contact with him. Michael, placed at less than three months of age, cannot have any present memories of living under his father's care, but the persistence of visitation has permitted the establishment of some kind of relationship: Michael knows that John is his father because he has been so informed and he shows no negative reaction to his father's visits. Nathan lived for his first 20 months in a home where childcare was shared between his mother and father. He may well have present memories of that time, in addition to the associations from the visits over the course of the subsequent 20 months. Given the gloss that has been placed on this ground by recent caselaw (see e.g. In Re Jessica M., 217 Conn. 459 (1992); In Re Valerie D., 223 Conn. 492 (1992),) notwithstanding the plain meaning of the words set forth in the statute, such ground cannot be found in the circumstances of this case.
4. The petitioner has, however, made out by far more than the mandated clear and convincing standard grounds to terminate John G.'s parental rights for failure to rehabilitate. In his trial memorandum the father does not assert any greater ability to care for his children on 6/10/92 than he had on the date of commitment, 3/19/91. Rather, he rests on language of a case that turned upon the statute as it was written prior to being amended to its present form. In the case of In Re Migdalia M., 6 Conn. App. 194 (1986) both the facts and the applicable statute were inapposite to the present case. The trial court's finding that the father of Migdalia had failed to rehabilitate was reversed on two grounds:
 (1) Migdalia suffered from renal failure necessitating extraordinary ongoing medical attention: ". . .
 [T]heir parental limitations lie in their inability to care for a seriously ill child . . . They can never be restored to the parents they were before the child became so seriously ill. It is the child's health problems, not some personal deficiency of theirs which caused the original commitment." (Id. at p. 205). CT Page 9962
 (2) The statute them applicable did not require, as it now does, the court to find that termination of a parent's rights is in the child's best interests or that a parent is predicted to be incapable of assuming ". . . a responsible position in their child's life" not "within a reasonable time, considering the age and needs of the child" at present but rather "at some future date", without reference to the particular child's age and needs. In reversing the judgment of termination, the Appellate Court stated:
 "If the statutory standard for termination of parental rights included the best interests of the child and required personal rehabilitation to occur with a reasonable time, considering the age and needs of the child, as it now does, a different result might be warranted in this case." (Id. at p. 207).
Neither of these factors is present in the instant case. The G. children have developmental delays which require a high degree of responsible parenting, but they do not require extraordinary medical or institutional care. Further, the statute applicable in June of 1992 when this action was initiated does require consideration of the best interests of the children, and does require an estimate of parental rehabilitation occurring within a reasonable time considering the age and needs of the particular children involved. All of the expert testimony offered at trial in this case was unanimous and unrefuted in concluding that both children urgently required permanency after more than 19 months in continuous foster care. The experts were also unanimous in their opinion that, considering the length of time their father had already been given in which to demonstrate an enhanced ability to meet their needs, and the apparent deterioration of that ability during the period of commitment, it could not be predicted that at any future date, much less within a reasonable time considering the ages and needs of these boys, he would ever be able to do so.
The practical test of this ground for terminating a parent's rights is the comparison of that parent's ability to CT Page 9963 meet a child's needs on the adjudicatory date of the termination petition (6/10/92) with the level of ability on the date the child was committed as neglected or uncared for (3/11/91). Such comparison here compels a finding that these grounds exist to terminate John G.'s parental rights: In March of 1991 he was living with his wife in a home rented in their names and receiving services of various community providers all designed to facilitate the return of the children home as soon as consistent with their physical safety and developmental wellbeing. By June of 1992, John G. had separated from his wife, had been unable to establish any residence in his own name in the seven months following such separation to which he could take his sons for extended visits, and he had just returned from a three month stay in Oklahoma which he had undertaken against the clear advice of DCYS. The predictability of his being able to care for these children within a reasonable time was far weaker in June of 1992 than it was when the boys were committed 15 months earlier. If failure to rehabilitate cannot be found on such a record, it cannot be found in any case.
The petitioner has thus provided far more than the requisite clear and convincing proof that this ground exists to terminate the parental rights of John G.
Disposition — On facts as of 6/30/93, the final trial date.
In the year between the adjudicatory and dispositional dates, John G. has maintained his residence in Connecticut and has resumed visitation with the children. This, however, is the only positive step taken toward any resumption of their parenting. The father not only has not achieved a place to live where he could take the children and demonstrate an improved capacity for caring for them, but was, on the final trial day, living in an overcrowded house rented to an alleged child sexual molester who had lost custody of three of her own children and where, since his presence was not permitted by the owner of the home, he could not receive mail and therefore was ineligible for city assistance or for medical insurance under Title XIX. In contrast, then, to his situation when the children were committed, on the dispositional date the father had no source of income, no medical coverage for himself, no legal mailing address, no employment or prospect for employment. While his visits to the children remained unproblematic, he had never demonstrated any improved ability CT Page 9964 to meet either their ordinary or special needs on an enduring basis. Parenting services, resumed in the fall of 1992 at his request, were discontinued three months later when he continued to be unable to provide a home where he could demonstrate whether or not he had internalized, and therefore could sustain, the instructions given, rather than simply respond to "prompting" of service providers.
In his last evaluation (State's Exh. B), Dr. Robert Meier reported that John G. had admitted that he had trouble with impulse control and continued to make hasty decisions he later regretted. Since he was unable to see the consequences of his acts, he continued to make "inconsistent or inappropriate responses to his problems." (Id. at p. 4.) Dr. Meier concluded that John ". . . has the ability to learn basic parenting skills but is also hampered by problems with judgment, awareness of consequences and impulsiveness." (Id. p. 6.) Although of low normal intelligence, he seemed to Dr. Meier even further removed than the retarded mother from following "the advice and explanations given by service providers." He concurred with Kathleen Bradley's prediction that even if services were to be continued indefinitely, . . . "there would be limited further improvement" due to "denial of responsibility, the projection of blame on to others, impulsive behavior and proof judgment." (Id. pg. 9). Dr. Meier concluded that because the foreseeable future did not predict an ability to care independently for these children, even with constant services on a daily basis — which were "not realistically available" (Id. p. 10) — termination was required since ". . . further time is likely to be detrimental to the best interests of the child[ren]" who required being "placed permanently in a stable family situation, outside the natural family." (Id. p. 11).
Before such termination can be ordered, however, this court must consider the seven factors set forth in subsection (d) of Sec. 17a-112 (as amended by P.A. 93-193).
(1) The services offered and provided to John G. by a variety of agencies were timely, extensive, appropriate and extended for long periods of time.
(2) The efforts made by DCYS to reunite this family were reasonable and prolonged for far longer than the period recommended by Dr. Meier at the time the children CT Page 9965 were committed.
(3) No court orders were entered, but the expectations of the court and the agreements made by the parents were never sustained.
(4) These children have no negative feelings for their father, but the emotional ties of children placed in foster care at 20 months and three months respectively cannot, after 31 months of continuous foster placement, be more than the ties of any young children with a friendly visitor.
(5) These children aged four and not quite three on the dispositional date, have been in foster care for over two and one half years. Dr. Meier had recommended no longer than one year in foster care; they have now spent more than double that period. They cannot afford to wait longer for such an uncertain outcome.
(6) The only effort John G. has made to adjust his circumstances to facilitate return of the children to his care has been to limit the period he had abandoned them to three months, to visit the children consistently for all except for those three months, and to cooperate with service providers by acceding to the "promptings" given during supervised visits. His failure to obtain an appropriate residence where visits could be extended without supervision has made further efforts at reunification impossible.
(7) No one has prevented John G. from maintaining a meaningful relationship with his children. Requiring visits to be supervised in places other than his home was reasonable considering his living circumstances.
Having considered the foregoing, as well as the unrefuted expert testimony of Dr. Meier as to what the best interests of these children required, it is found, by clear and convincing evidence to be in their best interests for their parents' rights to be terminated so that they may know, for the first time in over two and one-half years, the security of permanency essential to their wellbeing.
Therefore, it is ORDERED that the parental rights of John CT Page 9966 G. and Alice C. (formerly Alice G.) in and to their sons Nathan G. and Michael G. be, and they hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS (now DCF, P.A. 93-91) be appointed statutory parent for the purpose of placing these children in adoption as expeditiously as is consistent with their best interests. To ensure this end, the said Commissioner is further ORDERED to submit to this court in writing a report as to the progress toward adoption no later than 90 days following the date of this judgment, and thereafter to report in such form and at such intervals as this court may from time to time require. If adoption for either child is not finalized by March 1, 1995, the said Commissioner is further ORDERED to file a Motion for Review of Terminated Child, to conform with federal requirements.
Appeal
John G. has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by his trial counsel of the court's judgment and his right to take an appeal, he affirmatively manifests his desire to do so, if his trial counsel is willing to act in that capacity, the court will appoint him for this purpose. If the respondent manifests his desire to take an appeal and if his trial counsel declines to represent him because, in his professional opinion, it lacks merit, he is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the father on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, such attorney is requested to make this known to the court at the earliest possible moment, and the respondent father will be informed by the clerk forthwith that he has the balance of the extended appeal period in which to secure his own counsel who, if qualified, may be appointed to represent him on the appeal. If he does not do so, then upon expiration of the extended appeal period, his right to pursue an appeal will be ended and the termination of his parental rights final. The children will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965), they are CT Page 9967 even more appropriate where there are interests of a third party involved: Those of the child whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise him is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom the passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Willimantic this 17th day November, 1993.
Brenneman, Judge